## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **RICHARD MYER BANKS (1),** | ) | |
| **MARY LAFFICER DOYLE (2),** | ) | |
| **STANLEY ALLEN ACUFF (3),** | ) | |
| **MELANIE POOL ALPHIN (4),** | ) | |
| **LISA RENEE BELL (5),** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 05-CV-278-TCK-PJC** |
| | ) | |
| **ALBERTO R. GONZALES,** | ) | **OPINION AND ORDER** |
| **ATTORNEY GENERAL,** | ) | |
| **UNITED STATES** | ) | |
| **DEPARTMENT OF JUSTICE (1);** | ) | |
| **LEONIDAS RALPH MECHAM,** | ) | |
| **DIRECTOR, ADMINISTRATIVE** | ) | |
| **OFFICE FOR THE UNITED** | ) | |
| **STATES COURTS (2);** | ) | |
| **ROBERT S. MUELLER, III,** | ) | |
| **DIRECTOR, FEDERAL BUREAU** | ) | |
| **OF INVESTIGATION (3);** | ) | |
| **DAVID E. O'MEILIA, UNITED** | ) | |
| **STATES ATTORNEY FOR** | ) | |
| **THE NORTHERN DISTRICT** | ) | |
| **OF OKLAHOMA (4);** | ) | |
| **BRAD STEWART, CHIEF** | ) | |
| **UNITED STATES PROBATION** | ) | |
| **OFFICER FOR THE NORTHERN** | ) | |
| **DISTRICT OF OKLAHOMA (5),** | ) | |
| | ) | |
| **Defendants.** | ) | |

Before **KERN**, **EAGAN**, and **PAYNE**, District Judges sitting as an *en banc* panel.

---

**KERN**, District Judge.

1

## OPINION AND ORDER

Before the Court are:  (1)  Plaintiffs' Second Amended Complaint (Docket No. 13), filed June 7, 2005, which requests a permanent injunction and declaratory relief enjoining Defendants from forcing Plaintiffs to comply with the DNA Backlog Elimination Act of 2000, Pub. L. No. 106-546, 114 Stat. 2726 (Dec. 19, 2000) (codified at, *inter alia*, 42 U.S.C. § 14135a, as amended by USA PATRIOT Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (Oct. 26, 2001), as amended by Justice For All Act of 2004, Pub. L. No. 108-405, 118 Stat. 2260 (Oct. 30, 2004)) ("DNA Act"); (2) Federal Defendants' Motion to Substitute the United States as the Sole Defendant and Dismiss the Individual Defendants (Docket No. 21), filed August 8, 2005; and (3) Federal Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint (Docket No. 22), filed August 8, 2005.

I.    **Procedural History**

On May 12, 2005, the Office of the Federal Public Defender for the Northern District of Oklahoma filed a Complaint and Application for Emergency Restraining Order, Declaratory, and Injunctive Relief in the criminal case of *United States v. Banks*, 01-CR-124-TCK, seeking to forbid the United States Probation Office for the Northern District of Oklahoma ("Probation Office") from conducting a planned blood collection of Defendant Richard Banks ("Banks") and other similarly situated supervisees and probationers.  The collection was scheduled for May 17, 2005.  The United States responded, arguing that such relief could not be requested in the criminal case.  On May 19, 2005, the Court ordered the matter to be opened as a civil case, which was styled *Banks, et al. v. United States Department of Justice, et al.*, 05-CV-278-TCK-PJC.

On June 7, 2005, Banks and four other individual Plaintiffs filed a Second Amended Complaint in the civil case, which named five individual Defendants acting in their official

2

capacities as governmental officials.  The Second Amended Complaint seeks a permanent injunction forbidding the Probation Office from collecting DNA samples from Plaintiffs and declaratory relief determining that the DNA Act, as last amended in 2004, is unconstitutional as applied to Plaintiffs because it violates Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures.  On August 8, 2005, the United States filed a Motion to Dismiss the Second Amended Complaint ("Motion to Dismiss") and a Motion to Substitute the United States as the Sole Defendant and Dismiss Individual Defendants ("Motion to Substitute").  On September 13, 2005, the Court entered an Order empaneling the three Judges of the Northern District of Oklahoma to sit *en banc* in ruling on Plaintiffs' Motion for Permanent Injunction and the two Motions filed by the United States.[1]  On November 21, 2005, the *en banc* Court held a hearing on these three Motions.

II.   **Parties**

     This case was brought by five individual Plaintiffs who were convicted of felonies and who are serving terms of probation or supervised release in the Northern District of Oklahoma. Information regarding the criminal history of each specific Plaintiff is as follows: (1) Richard Myer Banks, Case No. 01-CR-124-K:  Banks pled guilty to one count of bank fraud.  On February 27, 1998, he was sentenced to thirty-five months custody and five years supervised release in the

---

[1]  In the Order empaneling the Court to sit *en banc*, the Court clarified that it would not sit as a "Three-Judge Court" as required in certain cases pursuant to 28 U.S.C. § 2284 and as discussed in Northern District Local Civil Rule 9.1.  Instead, the *en banc* Court was empaneled at the discretion of Judge Terence Kern, the Judge assigned to this case.  *See* 17 Charles A. Wright, Arthur R. Miller, Edward H. Cooper, *Federal Practice & Procedure: Jurisdiction* § 4234 (2d ed. 1988) ("On occasion a district court may choose to have three of its judges, or some other number greater than one, sit in a particular case, but such a court has the same powers and procedure as a single judge would in any other district court case and review is in the court of appeals as in any other case."); *Carlsbad v. Union Sch. Dist. v. Rafferty*, 300 F. Supp. 434, 441 (S.D. Cal. 1969).

Eastern District of Pennsylvania.[2]   On November 5, 2001, jurisdiction of supervised release was transferred to the Northern District of Oklahoma. (2)  Mary Lafficer Doyle, Case No. 04-CR-59-C:  Doyle pled guilty to one count of theft of government funds.  On October 22, 2004, she was sentenced to five years probation. (3) Stanley Allen Acuff, Case No. 01-CR-45:  Acuff pled guilty to one count of wire fraud.  On November 7, 2001, he was sentenced to sixteen months custody and three years supervised release.  On August 21, 2003, it was found that Acuff had committed crimes of false impersonation and knowingly concealing stolen property while on supervised release.  The court revoked his term of supervised release, and Acuff was sentenced to twelve months custody and two years supervised release. (4)  Melanie Pool Allphin, Case No. 02-CR-77-S:  Allphin pled guilty to misprision of a felony in the Eastern District of Oklahoma.  The underlying crimes that Allphin failed to report related to possession with intent to distribute methamphetamine.  On February 13, 2003, she was sentenced to five years probation.  Allphin is being supervised by the Probation Office for the Northern District of Oklahoma. (5) Lisa Renee Bell, Case No. 97-CR-154-K:  Bell pled guilty to one count of using a false social security number.  On May 13, 1998, she was sentenced to fourteen  months custody and three years supervised release.  On December 15, 2003, it was found that Bell had committed crimes of false statement in violation of 18 U.S.C. § 1001 and false use of a social security number in violation of 18 § U.S.C. 408(a)(7)(b).  The court revoked her term of supervised release, and she was sentenced to twelve months and one day and twenty-three months supervised release.  All five Plaintiffs have been convicted of crimes that, prior to the 2004 Amendments, would not have subjected them to forced DNA collection under the DNA Act.

The five Defendants are: (1) Alberto Gonzales, Attorney General, U.S. Department of

---

[2] Unless otherwise indicated, all cases originated in the Northern District of Oklahoma.

Justice; (2) Leonidas Ralph Mecham,  Director, Administrative Office for the United States Courts; (3) Robert S. Mueller, III, Director, Federal Bureau of Investigations; (4) David O'Meilia, United States Attorney for the Northern District of Oklahoma; and (5) Brad Stewart, Chief United States Probation Officer for the Northern District of Oklahoma.  These are representatives of governmental entities that would potentially be impacted by the Court's grant of injunctive relief.

III.     **United States' Motion to Substitute the Unites States as the Sole Defendant**

The United States' Motion to Substitute is made pursuant to Federal Rule of Civil Procedure 21, entitled "Misjoinder and Nonjoinder of Parties," which provides in relevant part as follows: "Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just."  FED. R. CIV. P. 21.  It is undisputed that the individual Defendants are being sued in their official capacities.  The United States relies on cases indicating that "official capacity" suits are "actually" suits against the United States, arguing that the United States should therefore be substituted as the sole Defendant.  *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent."); *Atkinson v. O'Neill*, 867 F.2d 589, 590 (10th Cir. 1989) ("When an action is one against named individual defendants, but the acts complained of consist of actions taken by defendants in their official capacity . . . the action is in fact one against the United States."); *Simmat v. United States Bureau of Prisons, et al.*, 413 F.3d 1225, 1232 (10th Cir. 2005) ("Although nominally brought against the prison dentists, Mr. Simmat's claim is in reality against the United States.").

As conceded by the United States, however, this is not a case in which the United States must be substituted as a party pursuant to statute.  *See, e.g.*, 28 U.S.C. § 2679(d)(1) (requiring that the

United States be substituted as the proper-party Defendant in tort claims).  Nor is it a case in which

substitution is necessary in order to allow the United States to assert the defense of sovereign

immunity.[3]  Instead, the United States urges the Court to substitute the United States for the sake of

procedural ease and because it is not "necessary" for the individuals and agencies to be named to

effectuate the requested injunctive relief.  Plaintiffs argue that the individual agencies are named

Defendants in order to eliminate any question about the scope and effect of a possible injunction.

The Court finds there is no procedural or substantive reason to disturb Plaintiffs' choice to name and

sue the agencies impacted by suing the individual Defendants in their official capacities.  Although

the suit may, in reality, be one against the United States, the Court believes Plaintiffs' election

should control where there is no overriding substantive or procedural reason to substitute the United

States as the sole Defendant.  The Motion to Substitute is therefore denied.

IV.    **Defendants' Motion to Dismiss/Plaintiffs' Motion for Permanent Injunction**[4]

  A.  ***Background on the DNA Act and the 2001 and 2004 Amendments***

---

[3]  The United States does not enjoy sovereign immunity in cases involving injunctive relief.  *Compare, e.g., Simmat*, 413 F.3d at 1232 (explaining that 5 U.S.C. § 702 waives sovereign immunity to actions for injunctive relief and finding that sovereign immunity was not a bar to suit brought for injunctive relief against prison dentists acting in their official capacities), *with Atkinson*, 867 F.2d at 590 (finding that suit naming officials acting in their official capacity was actually one against the United States and dismissing case against IRS officials based on sovereign immunity), *Weaver v. United States*, 98 F.3d 518, 520 (10th Cir. 1996) ("[T]he district court properly substituted the United States as the party defendant in this case, and the doctrine of sovereign immunity precludes this suit [brought under the Federal Tort Claims Act]."), *and National Commodity & Barter Ass'n v. Gibbs*, 886 F.2d 1240, 1246 (10th Cir. 1989) (plaintiff cannot avoid sovereign immunity by naming individual officers as defendants).

[4]  There are no factual issues in dispute, and the questions before the Court are solely questions of law.  Accordingly, the Motion to Dismiss and Motion for Permanent Injunction are addressed simultaneously.

On December 19, 2000, Congress passed the original version of the DNA Analysis Backlog Elimination Act.  The original DNA Act required persons convicted of "qualifying federal offenses" to provide a DNA sample to be included in the Combined DNA Index System ("CODIS"), a national database.  The DNA Act originally classified the following crimes as qualifying federal offenses: (1) murder, voluntary manslaughter, or other offense relating to homicide; (2) an offense relating to sexual abuse, to sexual exploitation or other abuse of children, or to transportation for illegal sexual activity; (3) an offense relating to peonage and slavery; (4) kidnapping; (5) an offense involving robbery or burglary; (6) any violation of section 1153 involving murder, manslaughter, kidnapping, maiming, a felony offense relating to sexual abuse, incest, arson, burglary, or robbery; and (7) any attempt or conspiracy to commit any of the above offenses.  *See* Pub. L. No. 106-546, 114 Stat. 2726 (Dec. 19, 2000).

The DNA Act originally provided, and continues to provide, that collection of DNA samples shall be taken (1) from individuals in custody, and (2) individuals on release, parole, or probation. 42 U.S.C. § 14135a(a)(1)-(2).  For those in custody, the DNA sample is collected by the Bureau of Prisons.  *Id.* at § 14135a(a)(1).  For those on release, probation, or parole, the DNA sample is collected by the federal probation office responsible for supervision.  *Id.* at § 14135a(a)(2).  With the passage of the DNA Act, Congress also amended the supervised release statute, requiring the giving of a DNA sample as an explicit condition of supervised release for qualifying federal offenses.  *See* 18 U.S.C. § 3583(d) ("The court shall order, as a condition of supervised release, that the defendant cooperate in the collection of a DNA sample . . . if the collection of such a sample is authorized [under the DNA Act].").  Nearly every state has a statute similar to the DNA Act, and samples collected by state entities are also included in CODIS.  *See Miller v. United States Parole*

7

*Comm'n*, 259 F. Supp. 2d 1166, 1167 (D. Kan. 2003).

In 2001, the DNA Act was amended by the passage of the USA Patriot Act (the "2001 Amendments").  The USA Patriot Act added the following crimes to the above list of "qualifying federal offenses":  any offense listed in 18 U.S.C. § 2332b(g)(5)(B [federal crime of terrorism], any "crime of violence," as defined 18 U.S.C. § 16,[5] and any attempt or conspiracy to commit the above offenses.  *See* Pub. L. No. 107-56, 115 Stat. 272 (Oct. 26, 2001).

Effective October 30, 2004, the DNA Act was amended a second time (the "2004 Amendments").  The 2004 Amendments eliminate the previous two lists of qualifying federal offenses and provide as follows:

> (d) Qualifying Federal offenses
> The offenses that shall be treated for purposes of this section as qualifying Federal offenses are the following offenses, as determined by the Attorney General:
> (1) *Any felony*.
> (2) Any offense under chapter 109A of Title 18.
> (3) Any crime of violence (as that term is defined in section 16 of Title 18).
> (4) Any attempt or conspiracy to commit any of the offenses in paragraphs (1) through (3).

42 U.S.C. § 14135a(d)(1)-(4) (emphasis added).  Most significantly, the 2004 Amendments extend the "qualifying federal offenses" to "any felony."  Thus, the 2004 Amendments extend the reach of the DNA Act, for the first time, to felonies that are not violent or sexual in nature, such as bank fraud, wire fraud, and the other felonies committed by Plaintiffs in this case.  Failure to comply with the DNA Act results in a criminal Class A misdemeanor.  42 U.S.C. § 14135a(a)(5).

---

[5]  A crime of violence is defined as "(a) an offense that has an element the use, attempted use, or threatened use of physical force against the person or property of another, or (b) any other offense that is a felony, and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 16.

The DNA Act allows the DNA test results to be used only for four specified purposes: (1) for law enforcement identification purposes; (2) in judicial proceedings if otherwise admissible; (3) for criminal defense purposes; and (4) for a population statistic database, for identification research, or for quality control purposes, if personally identifiable information is removed. *See* 42 U.S.C. §14135e(b) (stating that test results to be used only for specified purposes); 42 U.S.C. §14132(b)(3) (listing specified purposes). The DNA Act also provides for expungement of the DNA information upon reversal or dismissal of a conviction. 42 U.S.C. §14132(d).

The Tenth Circuit, and other circuits, have unanimously upheld prior versions of the DNA Act and similar state statutes. *See United States v. Kimler*, 335 F.3d 1132, 1146 (10th Cir. 2003); *United States v. Kincade*, 379 F.3d 813, 830-31 n.25 (9th Cir. 2004) (listing over thirty cases upholding compulsory DNA profiling laws and explaining that only one federal district court and one state court had invalidated such laws). As explained above, however, the 2004 Amendments expand the list of "qualifying offenses" to include "all felonies," which necessarily encompasses non-violent and non-sexual offenses. Because the 2004 Amendments extend the reach of the DNA Act to offenses that arguably involve different circumstances and different concerns than prior versions of the DNA Act, the largely unanimous decisions upholding the DNA Act are not necessarily controlling with respect to the 2004 Amendments. Accordingly, it is necessary for the Court to analyze the 2004 Amendments with respect to those felons who are newly required to provide a DNA sample such as Plaintiffs in this case.

B.      ***Applicable Fourth Amendment Principles***

It is settled law that the drawing of blood is a search, subject to the Fourth Amendment. *See Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 616 (1989) ("A 'compelled intrusio[n]

9

into the body for blood' . . . must be deemed a Fourth Amendment search."). Because drawing blood is a physical intrusion, it infringes an expectation of privacy that society is prepared to recognize as reasonable. *Id*. The ensuing chemical analysis of the sample to obtain physiological data is a further invasion of the tested individual's privacy interests. *Id.* The less intrusive means of taking a DNA sample by cheek swab also constitutes a search, since the ensuing chemical analysis of the sample may effect an invasion of the searchee's privacy. *See Nicholas v. Goord*, 430 F.3d 652, 656 n.5 (2d Cir. 2005). Therefore, in the context of DNA profiling statutes, there are two intrusions at issue: (1) the physical intrusion when an individual is required to provide the sample by blood or cheek swab, and (2) the analysis and maintenance of the individual's information in the CODIS database. *See id.*[6]

The touchstone of a Fourth Amendment analysis is always whether searches and seizures are reasonable. *United States v. Knights*, 534 U.S. 112, 118 (2001). What is reasonable depends on all of the circumstances surrounding the search and the nature of the search. *Skinner*, 489 U.S. at 619. In general, the permissibility of a search is judged by "balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.* Typically, this balance is struck by requiring a search warrant based on probable cause. *Id.* However, "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion is an indispensable component of reasonableness in every circumstance." *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665 (1989); *Skinner*, 489 U.S. at 619 ("A showing of individualized suspicion is not a constitutional floor, below which a search must be

---

[6] The second intrusion has been viewed as both a search and a seizure. *See Goord*, 430 F.3d at 670.

presumed unreasonable.").

In cases involving the DNA Act or other similar state statutes, courts have applied one of two tests to uphold the warrantless, suspicionless searches associated with DNA collection of inmates or probationers. These tests are referred to as (1) the *Griffin* special-needs test, and (2) the *Knights* totality of the circumstances test.

1.      *Griffin* Special-Needs Exception and Accompanying Balancing Test

The Supreme Court has recognized a special-needs exception to the typical warrant and probable cause requirements, which dispenses with the requirement of individualized suspicion in certain instances.   *See Griffin v. Wisconsin*, 483 U.S. 868, 872 (1987) ("[W]e have permitted exceptions when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'"); *Skinner*, 489 U.S. at 619 (same). "When faced with such special needs, we have not hesitated to balance the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context." *Skinner,* 489 U.S. at 619.  Assuming the government can show a "special need" beyond the normal need for law enforcement, "[i]n limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." *Id*. at 624.  Under this doctrine, suspicionless searches are carefully scrutinized and held constitutional only when they serve a "valid special need divorced from law enforcement objectives."  *See City of Indianapolis v. Edmond*, 531 U.S 32, 41 (2000) (stating that permitting suspicionless searches to be justified by general interest in crime control would allow such intrusions to become routine part of American life).

In the *Griffin* case, the Supreme Court found that a state's operation of a probation system, like its operation of a school or prison, presents "special needs" beyond normal law enforcement that may justify departures from the usual warrant and probable cause requirements.  *Griffin*, 483 U.S. at 874-75.  The Court then balanced the intrusion into the probationer's privacy (search of a probationer's house by a probation officer based on a tip that probationer had illegal weapon) against the governmental interest (supervising probationers in order to intervene before a probationer does damage to himself or society) and held that it was reasonable to dispense with the warrant requirement in that case.  *Id.*

After *Griffin*, the Supreme Court struck down two searches because they did not serve a "special need" beyond law enforcement and therefore did not qualify for the special-needs exception.  *See City of Indianapolis v. Edmond*, 531 U.S. 32 (2000) (suspicionless searches conducted pursuant to Indiana law allowing random vehicle checkpoints in effort to interdict illegal drugs struck down because its "primary purpose was to detect evidence of ordinary criminal wrongdoing"); *Ferguson v. City of Charleston*, 532 U.S. 67 (2001) (policy of public hospital to conduct suspicionless drug screening of pregnant women's urine in an effort to solve epidemic of crack babies held unconstitutional because immediate objective was to generate evidence for law enforcement and in light of the extensive involvement of law enforcement at every stage of the policy).  While these cases indicated that any suspicionless search conducted for law enforcement purposes must be accompanied by some degree of  individualized suspicion, they were decided before the Supreme Court's decision in *Knights*, which, as explained below, indicates limitations to this rule.  *See Kincade*, 379 F.3d at 827 (explaining *Edmond* and *Ferguson* in detail and the implications of these decisions in light of *Knights*).

12

2.      *Knights* Totality of the Circumstances Test

In *United States v. Knights*, 534 U.S. 112, 118 (2001), the Supreme Court examined a warrantless, but not suspicionless, search of a probationer's apartment.  Knights' probation order included a condition that he would submit to search of his place of residence without a warrant.[7] After suspicious activity of vandalism occurred near Knights' house, a sheriff's deputy  conducted surveillance on Knights' residence and viewed objects used in the vandalism in the bed of Knights' truck.  The detective was aware of the search condition in Knights' probation order and thus believed a warrant was not necessary.  The detective conducted a warrantless search of the probationer's home.  The appellate court held this to be an unreasonable search.  The appellate court reasoned that the search did not constitute a "special needs" search similar to that in *Griffin* because the search in *Griffin* was conducted by a probation officer monitoring whether the probationer was complying with probation restrictions, rather than a deputy investigating a crime.

The Supreme Court reversed, reasoning that even if the search did not qualify for the "special needs" exception identified in *Griffin,* this did not eliminate the need for the appellate court to conduct an analysis of whether the search was reasonable under "our general Fourth Amendment approach of 'examining the totality of the circumstances.'"  *Id.* at 119.  The Court went on to determine the reasonableness of the search by "'assessing on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other hand, the degree to which [the search] is needed for the promotion of legitimate governmental interests.'"  *Id.*  Applying this test, the Court held that, in light of Knights' status as a probationer, the search condition, and the higher recidivism rate of probationers generally, the government needed only show a "reasonable

_____

[7]  Knights was originally convicted of a felony drug offense.

suspicion" to justify the search.  *Id.* at 121.  The Court held the government showed a reasonable suspicion and therefore the search was reasonable under the Fourth Amendment.

The Court in *Knights* therefore upheld a warrantless search designed purely to further law enforcement purposes and did so outside the confines of a "special needs" analysis.  Thus, "*Knights* suggests something of a departure from *Edmond* and *Ferguson* (and to a more limited extent *Griffin*)."  *See Kincade*, 379 F.3d at 828.  However, reasonable suspicion supported the search in that case, and the Court in *Knights* expressly left unresolved the question of whether "a search by a law enforcement officer without any individualized suspicion would have satisfied the . . . Fourth Amendment."  *Knights*, 534 U.S. at 120 n.6.  This has led to the circuit split regarding what test should be applied to DNA-indexing statutes, which is explained below.

C.      ***Circuit Law on Which Test to Apply to Searches Under the DNA Act or Similar State Statutes***

Although all circuit courts have reached the same result and upheld the DNA Act and the 2001 Amendments, they have not applied a uniform test.  Some circuits have utilized the *Griffin* special-needs analysis while others have applied the *Knights* totality of the circumstances analysis. The following quotation from a Third Circuit opinion summarizes the circuit split among courts on this issue in the context of the DNA Act or similar statutes:

> The courts of appeals that have addressed the constitutionality of the DNA Act or of similar state statutes, while unanimous in their decisions to uphold the statutes, are split as to whether to apply the *Knights* reasonableness standard or the *Griffin* special needs exception. The Fourth, Fifth and Ninth Circuit Courts of Appeals have utilized a reasonableness standard. *See Jones v. Murray*, 962 F.2d 302 (4th Cir.1992) (upholding Virginia DNA statute); *Groceman v. United States*, 354 F.3d 411 (5th Cir.2004) (relying on *Knights* to uphold the DNA Act); *Rise v. Oregon*, 59 F.3d 1556 (9th Cir.1995), and *United States v. Kincade*, 379 F.3d 813 (9th Cir.2004) (en banc, five judges endorsing the reasonableness standard; one, the special needs exception; and five dissenting). The Tenth Circuit Court of Appeals appears to be split. The court first analyzed the issue using a reasonableness analysis to uphold a Colorado

14

DNA statute. *See Boling v. Romer*, 101 F.3d 1336 (10th Cir.1997 [sic])[8] (principally citing *Jones* and *Rise*). However, more recently, and without substantive analysis, the court relied on the special needs doctrine to uphold the DNA Act. *See United States v. Kimler*, 335 F.3d 1132 (10th Cir.2003). The Second and Seventh Circuit Courts of Appeals have employed the special needs exception. *See Roe v. Marcotte*, 193 F.3d 72 (2d Cir.1999) (upholding Connecticut DNA statute); *Green v. Berge*, 354 F.3d 675 (7th Cir.2004) (upholding Wisconsin DNA statute).

*United States v. Sczubelek*, 402 F.3d 175, 184 (3rd Cir. 2005) (footnote added).

Courts that have applied the *Knights* test have done so, in part, because they interpreted the Supreme Court's decision in *Knights* as authorizing a general balancing test, rather than a special-needs test, when a person searched has a reduced expectation of privacy, regardless of whether the search is supported by individualized suspicion.  *See, e.g., Kincade*, 379 F.3d at 832 (reasoning that *Knights* affirmed the possibility that "conditional releasees' diminished expectations of privacy may be sufficient to justify the judicial assessment of a parole or probation search's reasonableness outside the strictures of special needs analysis"); *see also Goord*, 430 F.3d at 665 ("Courts that have relied upon *Knights* as justifying the application of a general balancing test to DNA-indexing statutes have emphasized Knights's status as a probationer and his knowledge of the probation search condition, which reduced his expectation of privacy.").

The Third Circuit stated a slightly different reason for applying the *Knights* test:  "Because we conclude that the purpose for the collection of DNA goes well beyond the supervision by the Probation Office of an individual on supervised release, as was the situation in *Griffin*, we believe it is appropriate to examine the reasonableness of the taking of the sample under the more rigorous *Knights* totality of the circumstances test rather than the *Griffin* special needs exception." *Sczubelek*,

---

[8]  *Boling* was actually decided on December 2, 1996.  Rehearing was denied on January 17, 1997.

402 F.3d at 184.  It is interesting, and perhaps misleading, that the Third Circuit describes the totality of the circumstances test as "more rigorous" than the special-needs analysis.  As stated by the Second Circuit in a recent decision:

> We find puzzling the Third Circuit's comment in *Sczubelek* that the special-needs inquiry is less rigorous than the general balancing test.  The special needs exception requires the court to ask two questions.  First, is the search justified by a special need beyond the ordinary need for law enforcement?  Second, if the search does serve a special need, is the search reasonable when the government's special need is weighed against the intrusion on the individual's privacy interest?  A general balancing test, on the other hand, only requires the court to balance the government's interest in conducting the search against the individual's privacy interests.

*Goord*, 430 F.3d at 664 n.22 (citations omitted).  Thus, courts applying the *Knights* test have done so based on differing rationale, but all with the underlying premise that a probationer's or prisoner's reduced expectation of privacy supports application of a general reasonableness test over a special-needs analysis.

In contrast, the most recent decision employing the special-needs test, and expressly rejecting the *Knights* test, is from the Second Circuit.  The Second Circuit reasoned that the Supreme Court has never applied a general balancing test to a suspicionless-search regime such as DNA testing. *Id.* at 666.  The court found that, until the Supreme Court adopts such an approach, "the more prudent route . . . is to construe *Knights* as dispensing with the special-needs analysis not solely because of the probation search condition, but also because of the existence of individualized suspicion." *Id.*  The court held that it would continue to hold suspicionless searches "to the higher standard of review embodied in the special-needs inquiry." *Id.* at 667.

As noted by other circuit courts, Tenth Circuit law is unsettled on this point.  *See Sczubelek*, 402 F.3d at 184 ("The Tenth Circuit Court of Appeals appears to be split."); *Kincade*, 379 F.3d at 830 (listing Tenth Circuit as a "special needs" circuit and citing *Kimler* decision); *Padgett v.*

16

*Donald*, 401 F.3d 1273, 1278 (11th Cir. 2005) (listing Tenth Circuit as a "special needs" circuit but

citing *Boling* as a "special needs" decision); *Goord*, 430 F.3d at 659 n.10 ("Prior to *Kimler*, the

Tenth Circuit applied a general balancing test to Colorado's DNA statute. *Kimler*, however, applied

the special-needs test without commenting on *Boling*.") (citations omitted).

      In *Boling*, the first Tenth Circuit case on point, the court addressed a challenge to a Colorado

statute requiring inmates convicted of offenses involving sexual assault to provide the state with

DNA samples before their release on parole. *See Boling v. Romer*, 101 F.3d 1336 (10th Cir. 1996).

The plaintiff in *Boling* was an inmate who had committed a sexual assault.  In *Boling*, the court

applied a traditional reasonableness analysis, relying extensively on the reasoning in *Jones v.

Murray*, 962 F.2d 302 (4th Cir. 1992),[9] and *Rise v. Oregon*, 101 F.3d 1556 (9th Cir. 1995), both of

which upheld DNA collection laws applying a traditional reasonableness analysis. The *Boling* court

did not mention the special-needs exception that had been applied by the Supreme Court in *Griffin*

in 1987.  After explaining the results and reasoning in *Jones* and *Rise*, the Tenth Circuit stated its

own reasoning for upholding the Colorado statute as follows:

> We are persuaded to reach the same result, with respect to the statute at issue here,
> as our sister circuits.  We do not rely on any supposition that sex offenders are more
> likely to be recidivists than others, nor, as the district court did, on the penological
> interests within the prison.  We do rely upon the specific relevance of DNA evidence
> to prove sexual assaults.  Thus we hold that while obtaining and analyzing the DNA
> or saliva of an inmate convicted of a sex offense is a search and seizure implicating
> Fourth Amendment concerns, it is a reasonable search and seizure.  This is so in light
> of an inmate's diminished privacy rights, *see Dunn v. White*, 880 F.2d 1188, 1195
> (10th Cir. 1989) (in upholding AIDS testings against inmates' Fourth Amendment
> challenge, stating that "plaintiff's privacy expectation in his body is further reduced
> by incarceration"), . . .; the minimal intrusion of saliva and blood tests; and the
> legitimate government interest in the investigation and prosecution of unsolved and

---

     [9] Because the *Jones* decision upheld a state statute extending to all felonies, it is relevant
to analysis of the issue presented and is discussed in more detail below.

> future criminal acts by the use of DNA in a manner not significantly different from the use of fingerprints.

*Id.* at 1340.  Following *Boling*, the Tenth Circuit issued other decisions upholding similar statutes, without providing substantial analysis.  *See, e.g., Schlicher v. (NFN) Peter, I & I*, 103 F.3d 940, 943 (10th Cir. 1996)  (upholding Kansas statute requiring persons convicted of unlawful sexual acts, murder, and other violent crimes to provide blood and saliva seeing "no reason to reiterate here that which was well said in *Boling*"); *Shaffer v. Saffle*, 148 F.3d 1180 (10th Cir. 1998) (upholding Oklahoma statute requiring DNA samples from individuals convicted of "sex-related crimes, violent crimes, or other crimes in which biological evidence is recovered" in suit brought by prisoner convicted of manslaughter and explaining that "it [the statute] is reasonable in light of an inmate's diminished privacy rights, the minimal intrusion involved, and the legitimate government interest in using DNA to investigate and prosecute crimes").

The most recent Tenth Circuit case, which involved a prior version of the DNA Act, is *United States v. Kimler*, 335 F.3d 1132 (10th Cir. 2003).  The plaintiff in *Kimler* was an inmate convicted of possession and distribution of images of minors engaged in sexually explicit conduct, who appealed his conviction and also challenged the constitutionality of the DNA Act.  In *Kimler*, the court held that "the DNA Act, while implicating the Fourth Amendment, is a reasonable search and seizure *under the special needs exception* to the Fourth Amendment's warrant requirement because the desire to build a DNA database goes beyond the ordinary law enforcement need."  *Id.* at 1146 (emphasis added).  As support for this sentence, the court in *Kimler* cites *Boling, Shaffer,* and *Schlicher,* explained above, which did not invoke the special-needs exception.  The *Kimler* opinion indicates, however, that the issue regarding the DNA Act was not extensively briefed.  *See id.* ("In a brief paragraph without supporting authority or a clear statement of his argument, Kimler

18

next argues that the DNA Act is unconstitutional . . . .").  Nor does the Court offer any explanation or analysis of its decision to employ a special-needs analysis rather than a general reasonableness analysis.

      D.    ***Test To Be Employed in this Case***

      In all instances in which the Tenth Circuit has conducted any substantive analysis of a DNA collection statute, it has applied a general balancing test akin to the *Knights* totality of the circumstances test.  Although the *Kimler* decision contains a rogue reference to the special-needs exception, the Tenth Circuit did not cite supportive cases and did not offer any explanation for its invocation of the special-needs doctrine.  Further, the issue was not the primary basis for the appeal in that case, and the court expressly stated the issue was not extensively briefed.  Thus, this Court does not read *Kimler* to mandate application of a special-needs test and finds that the substantive analysis in *Boling* in fact provides support for application of a general reasonableness test.

      In addition to finding that the *Knights* test is supported by Tenth Circuit law, this Court has considered the reasons articulated by various circuits for applying each respective test.  The Court agrees with the reasoning in those circuit cases holding that the Supreme Court's decision in *Knights* indicates the Supreme Court's willingness to apply a general reasonableness analysis to searches of probationers based on their diminished expectation of privacy, without requiring adherence to a special-needs analysis.  *See, e.g., Kincade*, 379 F.3d at 832 (reasoning that *Knights* affirmed the possibility that "conditional releasees' diminished expectations of privacy may be sufficient to justify the judicial assessment of a parole or probation search's reasonableness outside the strictures of special needs analysis"). The Court further aligns itself with the reasoning in *Kincade* that "neither *Edmond* nor *Ferguson* condemns suspicionless searches of conditional releasees in the

absence of a demonstrable need apart from law enforcement." *Id.* (stating that *Ferguson* itself recognized a distinction between searches of conditional releasees and searches of the general public and laid a framework for a "sound analytic division between these two classes of suspicionless searches"). Accordingly, this Court finds that the *Knights* totality of the circumstances, or general balancing test, should apply to analysis of the 2004 Amendments. This decision is in accord with the recent trend among circuit courts. *See United States v. Sczubelek*, 402 F.3d 175, 184 (3d Cir. 2005); *Padgett v. Donald*, 401 F.3d 1273, 1278 (11th Cir. 2005); *United States v. Kincade*, 379 F.3d 813, 832 (9th Cir. 2004) (four judges voting to apply *Knights* reasonableness test). *But see Nicholas v. Goord*, 430 F.3d 652, 656 (2d Cir. 2005) (applying "special needs" analysis because the court declined "to construe *Knights* as permitting us to apply a general balancing test to suspicionless searches"). Nonetheless, because Tenth Circuit law on which test to apply is unsettled, this Court will also analyze the 2004 Amendments under a special-needs test. The Court concludes that the 2004 Amendments are constitutional under either test.

E.   ***Application of Knights Reasonableness Test***

Under this test, the Court, in evaluating the totality of the circumstances, must balance (1) the degree to which the DNA profiling authorized by the 2004 Amendments interferes with the privacy interests of qualified federal offenders against (2) the degree to which DNA profiling of Plaintiffs promotes a legitimate governmental interest. *See Knights*, 534 U.S. at 118; *Padgett*, 401 F.3d at 1280.

It is settled law that parolees, supervisees, and probationers, such as Plaintiffs in this case, have a significantly diminished expectation of privacy. *See Griffin*, 483 U.S. at 875 ("[P]robationers . . . do not enjoy 'the absolute liberty to which every citizen is entitled, but only . . . conditional

liberty properly dependent on observance of special [probation] restrictions'"). In particular, individuals on supervised release have a reduced right to privacy in their identity. In *Sczubelek*, the court explained as follows:

> When [Plaintiff] was arrested, he was photographed and his fingerprints were taken. After his conviction of a felony, his identity became a matter of compelling interest to the government, and those marks of identification, the fingerprints and the photograph became a permanent record. Sczubelek can no longer assert a privacy interest in these means of identification. His DNA is a further - and in fact a more reliable - means of identification.

*Sczubelek*, 402 F.3d at 184. This Court agrees with the Third Circuit's holding that "[i]ndividuals on supervised release cannot reasonably expect to keep information bearing on their physical identity from government records." *Id.* at 185. Accordingly, for criminal offenders, regardless of whether such offender is confined to prison or is on supervised release, "the privacy interests implicated by the collection of DNA are minimal." *Id. See also Kincade*, 379 F.3d at 837 ("For parolees and supervised releasees especially - - individuals who while in custody have been subject to much more severe intrusions if their corporeal privacy than a sterile blood draw . . ., and who therefore leave prison with substantially reduced sensitivities to such exposure - the DNA Act's compelled breach of their bodily integrity is all the less offensive.").

The two intrusions at issue - the initial blood draw and the maintenance of the genetic information in CODIS indefinitely - must be considered against the backdrop of the probationer's or releasee's reduced expectation of privacy in information related to their identity. In general, the Supreme Court and the Tenth Circuit have deemed the level of intrusion caused by a blood or saliva test to be minimal. *See Skinner*, 489 U.S. at 625 (holding that blood tests do not infringe significant privacy interests); *Boling*, 101 F.3d at 1340 (noting "minimal intrusion" of saliva and blood tests). The gathering and retention of genetic information once the blood has been drawn is a potentially

21

greater intrusion than the initial extraction because "the state analyzes DNA for information and maintains DNA records indefinitely." *Goord*, 430 F.3d at 670.  However, most courts have still deemed this second type of intrusion to be minimal, in light of a prisoner's reduced expectation of privacy in genetic identifying information contained in the blood sample.  *See, e.g.*, *Kincade*, 379 F.3d at 837 (reasoning that "the DNA profile derived from the defendant's blood sample establishes only a record of the defendant's identity" and that "'once a person is convicted of [a qualifying felony under the DNA Act] his identity has become a matter of state interest and he has lost any legitimate expectation of privacy in the identifying information contained in the blood sample").

With respect to the governmental interest served by the intrusions, the 2004 Amendments require new analysis because some courts, including the Tenth Circuit, have listed the "specific relevance of the DNA evidence" to assist the government in the "investigation and prosecution of unsolved and future criminal acts" as at least one of the interests served by DNA profiling.  *See Boling*, 101 F.3d at 1340.  Therefore, specific analysis of the governmental interests served by collecting DNA from these particular Plaintiffs is necessary, separate and apart from the analysis provided by previous courts regarding interests served by collecting DNA from individuals convicted of other types of felonies.

Plaintiffs in this case argue that the 2004 Amendments, as applied to persons who have been convicted of non-violent and non-sexual offenses, cease to serve a significant or legitimate governmental interest because, unlike violent or sexual crimes, the solving of crimes such as bank fraud or wire fraud are simply not furthered by the collection of DNA evidence.  Some judges and courts have, in fact, indicated that DNA collection laws would not be constitutional as applied to non-violent or non-sexual offenders.  *See, e.g., Jones*, 962 F.2d at 315 (Murnaghan, J., concurring

in part and dissenting in part) ("The only state interest offered in including non-violent felons is administrative ease.  I cannot conclude that the government interest in administrative ease suffices to outweigh [a prisoner's privacy interests]. . . when that prisoner is not significantly more likely to commit a violent crime in the future than a member of the general population."); *Roe v. Marcotte*, 193 F.3d 72, 81 (2d Cir. 1999) (relying heavily on studies indicating a high rate of recidivism among sexual offenders and that DNA evidence is "particularly useful" in solving such crimes and quoting Judge Murnaghan's opinion in *Jones* that there was an "'extremely tenuous link connecting persons convicted of non-violent felonies to the commission of future violent crime'").

Prior to the 2004 Amendments, two courts upheld state DNA collection statutes that extended their reach to all convicted felons, regardless of the type of crime committed, finding that the governmental and public interests served outweighed the minimal intrusion.  In *Jones v. Murray*, 962 F.2d 302, 304 (4th Cir. 1992), the Fourth Circuit upheld a Virginia statute requiring all incarcerated felons to provide a blood sample for DNA analysis and storage. Similar to Plaintiffs in this case, the inmates argued the "general purpose of enforcing the law by improving methods of identification is not sufficient to justify testing an entire class of people merely because the recidivism rate is higher for them."  *Id.* at 305.  The government argued that "demonstrably higher rates of recidivism among [all] felons and the improved methods of identification provided by DNA analysis justify the search."  *Id.*  The court did not apply the special-needs exception but instead stated that "we consider the cases which involve the rights of prison inmates to comprise a separate category of cases to which the usual per se requirement of probable cause does not exist."  *See id.* n.2.  The court then applied a general balancing test and held that the state's interest in "preserving a permanent identification record of convicted felons" outweighed the minor intrusion.  *Id.* at 307.

Particularly relevant to the issue before this Court, the court reasoned that, based on the statistics presented, "Virginia's interest in DNA testing is significantly more compelling with regard to those felons convicted of violent crimes than those not." *Id.* at 308. Nonetheless, the court found that a "DNA print might be used to identify a criminal suspect who has attempted to alter or conceal" his identity. *Id.* The court also found that a "tax evader is fingerprinted just the same as a burglar," in justifying its decision that no individualized suspicion was required for the search. *Id.* The *Jones* case supports the government's position in this case that accurate identification of all felons is a significant public interest. However, Plaintiffs in this case are not incarcerated and therefore are not in the specific "separate category of cases" identified by the court in *Jones*.

In a more recent case, *Padgett v. Donald*, 401 F.3d 1273 (11th Cir. 2005), the court applied the *Knights* "totality of the circumstances" test to a Georgia statute requiring all convicted incarcerated felons to provide a DNA sample. The court found that because "the Supreme Court approves dispensing with the special needs analysis for probationers, we are persuaded that we may take a similar approach with cases involving prisoners, who enjoy less Fourth Amendment rights." *Id.* at 1279.[10] The court relied exclusively on *Jones* as precedent and, without much elaboration, held that "Georgia's legitimate interest in creating a permanent identification record of convicted felons for law enforcement purposes outweighs the minor intrusion involved in taking prisoners' saliva samples and storing their DNA profiles." *Id.* Again, this case is limited to incarcerated prisoners.

---

[10] The court implied that the DNA statute may not have qualified for the exception because it went to "general law enforcement." *Id.* at 1278. The court also noted that *Knights* left open the question of whether suspicionless searches of probationers are constitutional, since that case the Court found that reasonable suspicion existed. *Id.* n.5.

24

Since passage of the 2004 Amendments, the Court is aware of three cases discussing their constitutionality, all of which upheld the 2004 Amendments as authorizing reasonable searches. Two such cases are out of the Eleventh Circuit which, as explained above, had previously upheld a Georgia statute extending to all incarcerated felons.  Both of these courts concluded that "no meaningful distinction" existed between the Georgia DNA profiling statute upheld in *Padgett* and the 2004 Amendments. *See United States v. Castillo-Lagos*, No. 04-00292, 2005 WL 2033641 (11th Cir. Aug. 24, 2005); *United States v. Rodriguez-Benavides*, No. 04-00160, 2005 WL 2077761 (11th Cir. Aug. 30, 2005).  The third case, out of the Southern District of Iowa in the Eighth Circuit, applied the *Knights* totality of the circumstances test to the 2004 Amendments and held that collection of DNA from the defendant, an individual on supervised release who had been convicted of conspiracy to distribute methamphetamine, was a constitutional condition of supervised release. *See United States v. Bracy*, No. 97-CR-078, 2005 WL 1083212 (S.D. Iowa April 14, 2005).   The court found the following two interests asserted by the government to be compelling and to outweigh the defendant's reduced expectation of privacy:  (1) combating recidivism by solving crimes and removing dangerous offenders from the street; and (2) reducing the instances of injustice through DNA matching. *Id.* at * 4.  Although this case addressed the DNA Act as most recently amended, it did not address the new issues raised by the 2004 Amendments' extension to "all felonies."  None of these cases is particularly helpful with regard to what this Court views as the central issue presented - whether prior case law upholding the DNA Act is equally persuasive as applied to "all felonies," including those that are not potentially violent or sexual in nature.

Thus, the Court is without specific guidance from precedent as to the significance of the interests served by the 2004 Amendments' application to "all felonies."  The government asserts the

following as interests served: (1) obtaining identification information that can be used in the event independent evidence demonstrates a crime has been committed; (2) solving both past and future crimes; and (3) combating recidivism.  Further, the government asserts that "[t]he key function of the DNA Act is not general crime control . . . .The key function of the DNA Act is identification. The government's interest in building a DNA database for identification purposes, similar to its interest in maintaining fingerprint records, outweighs the minimal intrusion into a criminal offender's diminished expectation of privacy."  (Mot. Dismiss at 5.)

The government has presented no studies, legislative history, or other evidence indicating that identifying information of non-violent or non-sexual offenders will assist the government in solving past and future crimes or combating recidivism.  The Court concludes, however, that, in light of the public interests accepted by this Court, no specific evidence is necessary.  First, the Court finds that a significant and compelling public interest in the identification of all felons through DNA collection, much like the public interest is served by obtaining fingerprints and photographs of all felons.  In this regard, the Court relies on the oft-quoted passage from the Fourth Circuit's decision in *Jones*:

> It is a well recognized aspect of criminal conduct that the perpetrator will take unusual steps not only to conceal his conduct, but also his identity.  Disguises used while committing a crime may be supplemented or replaced by changed names, and even changed physical features.   Traditional methods of identification by photographs, historical records, and fingerprints often prove inadequate  . . . . Even a suspect with altered physical features cannot escape the match that his DNA might make with a sample contained in a DNA databank, or left at the scene of a crime within samples of blood, skin, semen, or hair follicles.   The governmental justification for this form of identification, therefore, relies on no argument different in kind from that traditionally advanced for taking fingerprints and photographs, but with additional force because of the potentially greater precision of DNA sampling and matching methods.

*Jones*, 962 F.2d at 307.  This reasoning applies to all types of felonies, including financial or other

26

non-violent crimes, and comports with reasoning in the Tenth Circuit case of *Boling*, which relied in part on the "legitimate government interest in the investigation and prosecution of unsolved and future criminal acts by the use of DNA in a manner not significantly different from the use of fingerprints." *Boling*, 101 F.3d at 1340. *See also Sczubelek*, 402 F.3d at 186 ("Moreover, we agree with the government that it has a compelling interest in the collection of identifying information of criminal offenders. A DNA database promotes increased accuracy in the investigation and prosecution of criminal cases . . . .").

Based on these cases, the Court concludes that the governmental interest in crime solving served by DNA profiling is not limited to matching DNA in the database to certain evidence found at the scene of a violent or sexual crime, such as blood or semen. Instead, the interest served by DNA profiling extends to matching DNA in the database to a particular suspect's DNA for purposes of correct identification of the perpetrator of a future or unsolved crime. In this regard, the governmental interest in collecting the DNA of an individual convicted of a non-violent crime such as bank fraud, for the purpose of correct identification of that convicted felon, is equally compelling as collection of DNA of an individual convicted of a violent or sexual crime.[11] The Court therefore views the interest of accurate identification for purposes of crime solving as distinguishable from DNA matching from evidence at a crime scene. While the latter is less persuasive in the context of non-violent and non-sexual offenders, the former extends to all types of offenders. In short, this

---

[11] At the hearing on this matter, the government asserted that DNA could be left behind by a perpetrator of a non-violent or non-sexual crime simply by their fingerprints or hair. In the absence of an evidentiary record regarding the precise way that DNA crime-scene evidence could be used to solve non-violent and non-sexual offenses, the Court will not rely on this justification. The Court instead relies on the government's interest in correct identification of individuals for purposes of crime solving.

Court is persuaded that accurate identification for purposes of crime solving, standing alone, is a significant governmental interest.  Another significant public interest related to supervision of those on supervised release is the public interest in ensuring that a parolee complies with the requirements of his release and is returned to prison if he fails to do so.  DNA profiling furthers this interest by "establishing a means of identification that can be used to link conditional releasees to crimes committed while they are at large." *Kincade*, 379 F.3d at 838.

With respect to combating recidivism, the Court also finds this to be a significant governmental interest that is promoted by DNA collection and retention.  An evidentiary record regarding higher recidivism rates among perpetrators of "all felonies" is not before the Court. However, the Supreme Court has held that "probationers are in need of rehabilitation and are more likely than the ordinary citizen to violate the law," *see Griffin*, 483 U.S. at 880, and that "[t]he recidivism rate of probationers is significantly higher than the general crime rate," *see Knights*, 534 U.S. at 120 (citing numerous statistical studies).  The Court finds nothing in these two Supreme Court decisions that would limit their reasoning to certain types of felonies.  Accordingly, the Court concludes that the collection of DNA from Plaintiffs in this case furthers the interest of combating recidivism in that it will deter offenders from committing crimes in the future.  *See Sczubelek*, 402 F.3d at 186 (listing direct and indirect ways collection of DNA serves interest of combating recidivism); *Kincade*, 379 F.3d at 838-39 ("The deterrent effect of such profiling . . . similarly fosters society's enormous interest in reducing recidivism.").  Put simply, the governmental interest in combating recidivism is furthered regardless of the type of crime committed.  Plaintiffs correctly argue that the Tenth Circuit's decision in *Boling* specifically relies only on  the higher recidivism rate of sexual offenders, limiting its recidivism analysis to that type of crime.  However, in light of

Supreme Court precedent, the Court finds that the recidivist rate of all convicted felons is such that the government has a strong interest in combating recidivism among this segment of the population.

The Court further concludes that the 2004 Amendments make no alteration in the overall collection, use, and retention scheme authorized by the DNA Act. Such scheme has been held by several courts to be specific, limited in scope, and to allow for limited discretion in the decision to take or not take a sample, thus reducing concerns regarding probable cause and individualized suspicion. *See, e.g., Sczubelek*, 402 F.3d at 187 (stating that DNA Act clearly delineates from whom the sample must be taken, who may take the sample, the permissible uses of the sample, the punishment for unauthorized disbursement of samples, and the expungement of the DNA information upon reversal of conviction).

While this Court agrees with Plaintiffs that not every public interest asserted in support of prior versions of the DNA Act are equally compelling in the context of non-violent and non-sexual offenders such as Plaintiffs, the Court finds the three public interests explained above are significant and apply equally to all types of felonies. In light of these significant governmental interests that are furthered by application of the DNA Act to Plaintiffs, the minimal intrusions occasioned by a blood draw or cheek swab and the retention of the genetic information, and Plaintiffs' reduced expectation of privacy in their identifying information, the balance of interests in this case clearly weighs in favor of the government. The Court therefore concludes that the searches authorized by the 2004 Amendments, as applied to Plaintiffs in this case, are reasonable under the *Knights* totality of the circumstances test.

F.  ***Application of Special-Needs Test***

Under this test, the government must identify a "special need" served by the search that goes

29

beyond law enforcement objectives.  This presents a more difficult task for the government because the interests accepted by the Court as being furthered by the 2004 Amendments - identification for purposes of crime solving, identification for purposes of violations of supervision released, and combating recidivism - all arguably relate to "law enforcement objectives."  The Court concludes, however, that reasoning in Tenth Circuit and other circuit precedent upholding the DNA Act and other similar laws under the special-needs test logically extends to the 2004 Amendments.

Although without explanation, the Tenth Circuit in *Kimler* clearly stated that "the desire to build a DNA database goes beyond general law enforcement needs."  *Kimler*, 335 F.3d at 1146. Assuming *Kimler* is persuasive precedent as to this issue, this statement by the Tenth Circuit, standing alone, provides sufficient support for this Court's finding that the 2004 Amendments serve a "special need" beyond law enforcement.  That is, the "desire to build a DNA database" is not tied to the type of crime committed, the usefulness of evidence collected at a crime scene in matching to the DNA database, or anything else that would require new analysis in relation to the 2004 Amendments' inclusion of "all felonies" as qualifying federal offenses.  Instead, the rationale that "building a DNA  database" is a special need that is not tied to law enforcement objectives extends equally to the 2004 Amendments.

In addition, or perhaps as further explanation of the "special need" that is the "desire to build a DNA database," the government cites the "special need" of accurate identification for purposes of solving past and future crimes.  Plaintiffs argue that "accurate identification" is not a purpose that exists independently from law enforcement objectives.  Instead, Plaintiffs argue that accurate identification is an ingredient of crime solving, thus making it fall outside the special-needs exception. *See City of Indianapolis v. Edmond*, 531 U.S. 32 (2000) (highway checkpoint scheme

did not qualify for special needs exception because the scheme was primarily for the ordinary

purpose of investigating crimes). However, courts applying the special-needs test have rejected this

argument. In *Nicholas v. Goord*, 430 F.3d 652, 658 (2d Cir. 2005), the most recent case applying

the special-needs test, the court acknowledged that New York's DNA-indexing statute served a

purpose that was "related" to law enforcement but did not "think that fact automatically

condemn[ed] the New York statute." The court drew a distinction between searches aimed at

determining whether a specific individual has engaged in some specific wrongdoing and searches

that are not aimed at the investigation of a specific crime:

> Although the DNA samples may eventually help law enforcement identify the
> perpetrator of a crime, at the time of collection, the samples "in fact provide no
> evidence in and of themselves of criminal wrongdoing," and are not sought "for the
> investigation of a specific crime." Because the state's purpose in conducting DNA
> indexing is distinct from the ordinary "crime detection" activities associated with
> normal law-enforcement concerns, it meets the special-needs threshold.

*Id.* at 669 (citations omitted). *See also Green v. Berg*, 354 F.3d 675, 678 (7th Cir. 2004) (applying

similar analysis and finding that a state DNA statute served a special need beyond law enforcement

objectives despite the fact that the DNA testing ultimately furthered a law enforcement goal).

Therefore, whether the "special need" is classified as "building a DNA database" or "creating a

DNA identification index to assist in solving crimes," the Court finds that the DNA Act serves a

special need beyond law enforcement objectives.

If a special need exists, the Court may obviate the individualized suspicion requirement and

employ instead a special-needs balancing test. Under this test, the court conducts a "'fact-specific

balancing of the intrusion on the . . . Fourth Amendment rights of [of the persons searched] against

the promotion of legitimate governmental interests'" *Goord*, 430 F.3d at 669 (quoting *Board of*

*Educ. of Indep. School Dist. No. 92 of Pottawatomie Cty. v. Earls*, 536 U.S. 822, 830 (2002)). No

31

court has specifically balanced, under the special-needs balancing test, the intrusion into the privacy rights of persons convicted of non-violent and non-sexual felonies against the government's interests in obtaining such information.  However, reasoning in cases applying the special-needs test, like the reasoning in cases applying the *Knights* totality of the circumstances test, is simply not tied to governmental justifications that are crime specific.  Instead, the justifications relate to the general need for maintenance of identifying information of convicted felons.  For example, in *Goord*, the court held:

> The collection and maintenance of DNA information, while effected through relatively more intrusive procedures such as blood draws or buccal cheek swabs, in our view, plays the same role as fingerprinting.  Given that the state likely already has a plethora of identifying information about plaintiffs, in light of their status as convicted felons, the additional intrusion effected by the DNA statute is insufficient to outweigh the state's strong interest in maintaining a DNA index.  In other words, plaintiffs' status as convicted felons renders minimal the degree to which the New York statute intrudes on their privacy.

*Id.* at 671.[12]  When the government's interest in DNA profiling is compared to the government's interest in maintaining fingerprint or other types of identification records, the interest carries the same weight regardless of the type of felony committed by the individual being searched.  For this reason, and for all reasons explained in detail above in this Court's balancing under the *Knights* test, the Court finds that the government's interest in collecting DNA from Plaintiffs in this case

---

[12]  In applying this reasoning in the balancing phase of the special-needs test, the Second Circuit appears to have, in some respects, departed from its analysis of the same issue in *Roe v. Marcotte*, 193 F.3d 72 (2nd Cir. 1999).  In *Roe*, the court did not mention the government's broad interest in accurate identification of felons and did not compare the government's interest in DNA collection to its interest in fingerprinting.  Instead, the court held that "[b]ecause studies cited by defendants indicate a high rate of recidivism among sexual offenders, and because DNA evidence is particularly useful in solving such crimes, the statute passes the 'special needs' balancing test."  *Id.* at 82.  Plaintiffs in this case relied heavily on the reasoning in *Roe* for their argument that the 2004 Amendments' application to non-violent and non-sexual offenders was not supported by studies or the usefulness of DNA evidence in solving crimes.

outweighs Plaintiffs' minimal privacy interest in their identifying information.  The Court therefore concludes that the searches authorized by the 2004 Amendments, as applied to Plaintiffs in this case, are reasonable under the special-needs test.

**V.**     **Conclusion**

For the reasons explained above, the United States' Motion to Substitute (Docket No. 21) is DENIED, the United States' Motion to Dismiss (Docket No. 22) is GRANTED, and Plaintiffs' request for Permanent Injunction and Declaratory Relief (Docket No. 13) is DENIED.

ORDERED this 14th day of February, 2006.

**TERENCE KERN**
**UNITED STATES DISTRICT JUDGE**